# Application of the Miscellaneous Receipts Act to the Settlement of False Claims Act Suits Concerning Contracts With the General Services Administration

The Miscellaneous Receipts Act allows the General Services Administration to retain as a "refund to appropriations" the entire amount representing actual damages paid by the Sprint Corporation and Worldcom, Inc. in settlement for overcharging the federal government for telecommunications services under contracts with GSA.

January 10, 2006

MEMORANDUM OPINION FOR THE ACTING GENERAL COUNSEL
GENERAL SERVICES ADMINISTRATION

The Sprint Corporation ("Sprint") and Worldcom, Inc. (known as "MCI") have settled claims for overcharging the federal government for telecommunications services under contracts with the General Services Administration ("GSA"). The Justice Department has remitted to GSA the amount of the settlement received by the United States that represents the actual damages. You have asked whether the Miscellaneous Receipts Act, 31 U.S.C. § 3302(b) (2000), allows GSA to retain this amount in its Information Technology Fund ("IT Fund" or "Fund"), or whether, instead, GSA should remit the money to the general fund of the Treasury or seek a means of allocating some or all of it among the numerous agencies that received telecommunications services pursuant to the GSA contracts. We conclude that the IT Fund may retain this entire settlement amount as a "refund to appropriations."

## I.

GSA is charged with "procur[ing] and supply[ing] personal property and non-personal services for executive agencies to use in the proper discharge of their responsibilities," which includes authority to "contract for public utility services" as the representative of executive agencies. 40 U.S.C. § 501(b)(1) (Supp. II 2002); *see id*. § 501(c). To finance GSA's provision of "information technology resources to federal agencies," Congress established the IT Fund, a revolving fund operating "without fiscal year limitation." 40 U.S.C. § 322(c) (Supp. II 2002).[1] The Admin-

---

[1] What is now known as the IT Fund dates from 1962. *See* Pub. L. No. 87-847, 76 Stat. 1117 (1962) (codified at 5 U.S.C. § 630g-1 (Supp. IV 1959–62)). Congress capitalized the initial fund with an appropriation of $10,000,000, *see Appendix to the Budget of the United States Government for the Fiscal Year Ending June 30, 1964*, at 728 (1963), and provided that the fund would be maintained by "advances and reimbursements" from agencies using telecommunications services "at rates determined by the [GSA] Administrator to approximate the costs [of the fund]," and by any "refunds or recoveries resulting from operations of the fund," including "receipts from carriers and others for loss of or damage to property," 76

istrator of GSA is authorized, "[i]n operating the Fund," to "enter into multiyear contracts, not longer than 5 years, to provide information technology hardware, software, or services," as long as certain conditions are met, 40 U.S.C. § 322(e)(1) (Supp. II 2002), and also retains his authority under section 501, *see id*. § 322(e)(2).

The GSA Administrator must determine the Fund's cost and capital requirements for each fiscal year, and these requirements "may include" (1) amounts "needed to purchase . . . information processing and transmission equipment, software, systems, and operating facilities necessary to provide services"; (2) amounts "resulting from operations of the Fund, including the net proceeds from the disposal of excess or surplus personal property and receipts from carriers and others for loss or damage to property"; and (3) any money "appropriated, authorized to be transferred, or otherwise available to the Fund." *Id*. § 322(b)(1). The Administrator must submit a plan concerning these requirements to the Director of the Office of Management and Budget ("OMB") "for review and approval." *Id*. § 322(b)(2). If the Director approves the plan, the Administrator must establish "rates, consistent with the approval, to be charged to agencies for information technology resources provided through the Fund." *Id*. § 322(d). You have explained that "[r]ates in the cost and capital plan are set at levels to ensure a fair and equitable allocation of GSA's costs," both "direct costs for services acquired, and GSA's overhead and internal costs of operations." Letter for Steven Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, from George N. Barclay, Acting General Counsel, General Services Administration at 5 (May 12, 2005) ("Barclay Letter"). "After the close of each fiscal year," GSA must "transfer[] to the Treasury as miscellaneous receipts" "any uncommitted balance remaining in the Fund, after making provision for anticipated operating needs" as determined by OMB. 40 U.S.C. § 322(f).

In 1998 and 1999, GSA's Federal Technology Service entered into contracts, known collectively as the FTS2001 contracts, with Sprint and MCI to provide telecommunications services. The contracts provided for the delivery of services to agencies government-wide and nation-wide. GSA negotiated and executed the contracts; was responsible for any dispute or discrepancy between a customer agency and a provider; provided customer support; and supplied legal, accounting, and technical services to the agencies. *See* Barclay Letter at 1–2, 6.

The FTS2001 contracts allowed GSA's customer agencies to place orders for services directly with the telecommunications providers. GSA set rates for these agencies pursuant to its authority under section 322(d), and these rates consisted of the charges imposed by the providers plus a percentage fee to cover GSA's expenses for "overhead" associated with the contracts and "capital maintenance of

Stat. at 1117. The current version of the IT Fund statute dates from 2002. *See* Pub. L. No. 107-217, § 322, 116 Stat. 1062, 1076–77 (2002).

the IT Fund." *Id.* at 2. The agencies could choose to be either "centrally billed" by GSA or "directly billed" by the providers. For centrally billed agencies, GSA would pay the providers from the IT Fund; the percentage fee was imbedded in GSA's invoices to each agency. For directly billed agencies, the providers included the percentage GSA fee in their bills and remitted this amount to GSA. Approximately 91% of the services for the relevant time period were centrally billed. The remaining 9% were directly billed. *See id.*

Sprint and MCI were sued by a relator under the False Claims Act, 31 U.S.C. § 3729(a) (2000), for overcharging the government for charges that the providers incurred for use of local telephone networks. The Department of Justice intervened in the suit on behalf of GSA to recover the overcharges. "The precise amount of actual damages is not known," you have explained, "because of the number of agencies participating under the contracts and the way in which the billing was performed. The contracts covered the entire nation, and [the relevant local charges] vary between counties and even within counties depending on time of day and type of line. Charges also changed depending on the contract year . . . ." Barclay Letter at 2–3. Likewise, although there are "invoices and underlying data for each agency," these "were not susceptible to individual analysis to determine the specific overcharge related to each line and service," and it is therefore "impossible to determine the exact amount by which each customer agency was overcharged." But the Justice Department (acting on behalf of GSA), the providers, and the relator negotiated a settlement in which the providers agreed to pay both actual and exemplary damages, and the parties agreed on an estimate of actual damages "based on averages and negotiations." Just as the precise overall amount of actual damages is not known, so also is it "impossible to determine . . . the proportion of the settlements attributable to individual agencies." After deducting the relator's share and an amount to cover its own costs, the Department remitted to GSA approximately $24.5 million from the settlement amount representing actual damages. *Id.* at 3. GSA wishes to retain this amount in the IT Fund "to apply to [future] government-wide telecommunications needs." *Id.* at 1. Neither OMB nor "the user agency representatives on the Interagency Management Council" objected to this plan. *Id.* at 3. You are not seeking to retain in the IT Fund the portions of the settlement attributable to exemplary damages. *Id.* at 3 n.1.

## II.

For the reasons explained below, the Miscellaneous Receipts Act ("MRA" or "Act") does not prohibit GSA from retaining in the IT Fund the settlement amount representing actual damages. Although no other statute specifically supersedes the Act's generally applicable requirements in this context, so as to justify GSA's retaining the settlement money in the Fund, GSA may nevertheless retain this amount under the "refunds" exception to the Act.

## A.

The Miscellaneous Receipts Act requires that "an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim." 31 U.S.C. § 3302(b). The reference to depositing "in the Treasury" could be considered ambiguous because it does not specify whether the money should be deposited into the general fund of the Treasury or instead into an agency-specific fund. *See Apportionment of False Claims Act Recoveries to Agencies*, 28 Op. O.L.C. 25, 27 n.5 (2004) ("*FCA Recoveries*"). But the longstanding view of the Executive Branch, shared by the Comptroller General,[2] has been that it requires the former. As early as 1909, the Comptroller of the Treasury, interpreting an earlier version of the Act, opined that "[d]epositing [moneys] in the Treasury to the credit of an appropriation would not be paying them into the Treasury within the meaning of this section." Letter for the Secretary of the Navy from the Comptroller of the Treasury, 50 MS. Comp. Dec. 1, 4 (July 2, 1909); *see also FCA Recoveries*, 28 Op. O.L.C. at 27 n.5. The Comptroller General similarly takes the view that "agencies ordinarily are required to deposit moneys they receive for the use of the United States in the general fund of the Treasury as miscellaneous receipts." *Federal Emergency Management Agency—Disposition of Monetary Award Under False Claims Act*, 69 Comp. Gen. 260, 261 (1990) ("*FEMA*").

Congress in the Act was "curb[ing] Executive discretion in the handling of public moneys and . . . ensur[ing] that all expenditures would be authorized by Congress." Memorandum for the Attorney General, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Legislation Regarding FBI Undercover Operations* at 5 (July 27, 1978) ("*FBI Operations*"). The original version of the Act "was expressly designed to ensure that the Executive did not reduce the congressional prerogative over public funds." Memorandum for Carol E. Dinkins, Assistant Attorney General, Land and Natural Resources Division, from Theodore B. Olson, Assistant Attorney General, Office of Legal Counsel, *Re: Effect of 31 U.S.C. § 3302(b) on the Settlement Authority of the Attorney General* at 13 n.8 (Mar. 25, 1983). We have particularly noted that it was Congress's purpose to codify the "anti-augmentation principle"—the principle that an agency may not augment its appropriations from outside sources without statutory authority. *E.g.*, Memorandum for James G. McAdams, III, Counsel for Intelligence Policy, from Richard L. Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Disposition of Funds at Conclusion of Joint FBI/DOD Undercover Operations* at 2–3 (June 27, 1997); *see also FCA Recoveries*, 28 Op.

---

[2] The Comptroller General is an agent of Congress. Therefore, as we have repeatedly stated, although his views often provide helpful guidance on appropriations matters and related issues, they are not binding upon departments, agencies, or officers of the Executive Branch.

O.L.C. at 27 n.5 (discussing "the anti-augmentation principle," "derived from the Constitution," that "an agency may not augment its appropriations from outside sources without statutory authority").

Consistent with these principles, the Executive Branch has for many years recognized two situations in which the Act would not require an agency to deposit money received "for the Government" into the general fund: (1) when Congress has specifically authorized the agency to retain such money, or (2) when the money can be considered a refund. In the first situation, Congress simply supersedes its own general statute with a specific statute—"creat[ing] an exception to the MRA" that gives "an agency . . . statutory authority to direct funds elsewhere." *Miscellaneous Receipts Act Exception for Veterans' Health Care Recoveries*, 22 Op. O.L.C. 251, 251, 254 (1998) ("*Veterans' Health Care*"); *see id*. at 254 (concluding that Congress created such an exception for the Veterans Affairs Medical Care Collections Fund by providing that certain "'[a]mounts recovered or collected'" under the Federal Medical Care Recovery Act "'shall be deposited in the fund'") (quoting 38 U.S.C. § 1729A(b)); *see also FBI Operations* at 6 (recognizing the "usual Congressional practice of formulating an explicit exception to the broad reach of [the MRA] on those occasions where [Congress] believes one necessary").

The second situation involves an exception for "refunds to appropriations," recognized by the Executive Branch since at least 1950. *FCA Recoveries*, 28 Op. O.L.C. at 27. The Treasury Department in that year defined "[r]efunds to appropriations" as "amounts collected from outside sources for payments made in error, overpayments, or adjustments for previous amounts disbursed, including returns of authorized advances." Treasury Department—General Accounting Office Joint Regulation No. 1, § 2(b) (Sept. 22, 1950), *reprinted in* 30 Comp. Gen. 595 (1950); *see also Veterans' Health Care*, 22 Op. O.L.C. at 254 (recognizing exception under Act "when receipts qualify as 'repayments' to an appropriation"). Similarly, in the practice of the Comptroller General, "'[t]he term "refund" . . . embraces a category of mostly nonstatutory exceptions in which the receipt is directly related to, and is a direct reduction of, a previously recorded expenditure.'" *FCA Recoveries*, 28 Op. O.L.C. at 27 (quoting 2 General Accounting Office, *Principles of Federal Appropriations Law* 6-109 (2d ed. 1992) ("GAO Redbook")). More broadly, the Comptroller General has "defined refunds to include refunds of advances, collections for overpayments made, adjustments for previous amounts disbursed, or recoveries of erroneous disbursements from appropriation or fund accounts that are directly related to, and reductions of, previously recorded payments from the accounts." *FEMA*, 69 Comp. Gen. at 262 (internal quotation marks and emphasis omitted). The refunds exception mitigates the force of requiring deposits into the general fund of the Treasury. The exception is grounded in, guided by, and furthers the anti-augmentation principle: An agency that recovers an amount it erroneously paid from an appropriation or fund account essentially returns to the position it had occupied based upon the authorization of

Congress. *See FCA Recoveries*, 28 Op. O.L.C. at 27 n.5; *see also Department of Energy—Disposition of Interest Earned on State Tax Refund Obtained by Contractor*, B-302366, 2004 WL 1812721, at \*3 (Comp. Gen. July 12, 2004) (refunds "simply restore[] to the appropriation amounts that should not have been paid from the appropriation").

## B.

One provision in 40 U.S.C. § 322 might be invoked to support the view that Congress has specifically authorized GSA to retain the settlement amounts at issue. Section 322(b)(l)(B) states that the IT Fund's cost and capital requirements "may include amounts . . . resulting from operations of the Fund, including the net proceeds from the disposal of excess or surplus personal property and *receipts from carriers and others for loss or damage to property*." 40 U.S.C. § 322(b)(l)(B) (emphasis added). We do not see a basis for reading the general reference to "amounts . . . resulting from operations of the Fund" as sufficient authorization to retain damages recovered in a settlement, but one might read the more specific reference to "receipts from carriers and others for loss" as broadly including within the Fund's cost and capital requirements from its operations any reimbursement for erroneously paid amounts of money, and thus necessarily contemplating that such amounts received as damages in litigation would be paid into the Fund. *See* Barclay Letter at 3–5.

We doubt, however, that the language will bear that construction. At the very least, the language is insufficiently clear to establish an exception for such reimbursements from the Miscellaneous Receipts Act's general requirement. First, the phrase "receipts . . . for loss or damage to property" may refer to compensation received (for example, from shippers) for loss of or damage to the government's property. Although this meaning would be clearer if Congress had instead referred to "loss *of* or damage to property," as the statute establishing the IT Fund did until 1986, *see* Pub. L. No. 99-591, sec. 821(a)(1), § 110(a)(2)(B), 100 Stat. 3341, 3341-341 (1986) (emphasis added); *see also supra* note 1, the difference is not material. The immediately preceding language of section 322(b)(l)(B) refers to proceeds from disposal of the Fund's "personal property," suggesting that the subparagraph as a whole addresses property rather than all funds. And other statutes appear to use interchangeably the phrases "loss *of* or damage to property" and "loss or damage to property." *See, e.g.*, 49 U.S.C. § 13906 (2000) (emphasis added).[3] Second, the phrase "carriers and others" does not in context clearly include providers of telecommunications services, such that reimbursement by a provider for a false claim could be considered a "receipt" from a "carrier." Rather,

---

[3] In addition, we are aware of no indication that Congress, in revising the IT Fund statute in 1986, intended to change its meaning.

the phrase may well refer to common carriers or "others" similarly charged with transporting or handling government property. The word is used in that sense in the related 40 U.S.C. § 501(c) (discussed in Part I), where "carriers" are described as those who provide "transportation . . . services."

Thus, the reference in section 322(b)(1)(B) to "receipts from carriers and others for loss or damage to property" is reasonably read in context to refer to receipts for government property lost or damaged by, or while in the custody of, government contractors. The Comptroller of the Treasury, in the opinion discussed above in Part II.A, used such language in this sense, referring to "the amount collected from carriers for loss or damage to freight while in transit." 50 MS. Comp. Gen. at 1; *see id.* at 3 (referring to "moneys received from carriers for loss or damages to freight lost while in transit"). More recently, the Government Accountability Office has treated the phrase "loss or damage to property" as interchangeable with the phrase "loss of or damage to property," and understood both as referring to receipts that could be used "to repair or replace the property." GAO Redbook at 6-123. We therefore read section 322(b)(1)(B) as not creating an exception to the Miscellaneous Receipts Act that would permit GSA to retain the settlement amount in the IT Fund.

## C.

GSA may nevertheless retain in the Fund the false-claims settlement for actual damages under the Act's exception for refunds. This entire settlement amount plainly constitutes a collection for overpayments within the definition of "refund" discussed above, and that amount therefore need not be deposited into the general fund of the Treasury. We recently determined in a similar case that, "in the context of false claims paid out of a revolving fund . . . , the 'collections for overpayments made' prong of the refund exception allows the agency to retain single damages." *FCA Recoveries*, 28 Op. O.L.C. at 27 (quoting *FEMA*, 69 Comp. Gen. at 262). We agreed with the conclusion in the Comptroller General's *FEMA* decision that FEMA could retain in its revolving National Insurance Development Fund "that portion of a damage award or settlement obtained pursuant to the False Claims Act that would reimburse the Fund for losses suffered as a result of a policyholder's false claims." *FEMA*, 69 Comp. Gen. at 260; *see also Tennessee Valley Authority—False Claims Act Recoveries*, B-281064, 2000 WL 230221, at *1 (Comp. Gen. Feb. 14, 2000) ("*TVA*") ("TVA should deposit into the [TVA] Fund any recoveries of actual damages it incurred as a result of a false claim (i.e., single damages), as well as any costs it incurred in investigating the false claim.").

Moreover, the IT Fund is the most appropriate account to receive the refund. It was the IT Fund from which GSA directly paid the charges, and thus any overcharges, for the vast majority of services—the approximately 91% of services that were centrally billed. The Fund's retention of the settlement amount for actual damages is therefore a collection of an overpayment by that Fund at least to the

(unknown but presumably large) extent that that lump sum represents overcharges of centrally billed services, *see FCA Recoveries*, 28 Op. O.L.C. at 27 (discussing collections for overpayments made by revolving funds); such retention is likewise a "recover[y]" by the IT Fund of "erroneous disbursements" and is "directly related to, and [a] reduction[] of, previously recorded payments from the account[]," *FEMA*, 69 Comp. Gen. at 262 (internal quotation marks and emphasis omitted).

It is immaterial that GSA, as part of the rates it imposed on its customer agencies pursuant to section 322(d), charged the centrally billed agencies for the telecommunications services provided to them under the contracts, and thus that the IT Fund presumably was reimbursed by these customer agencies for many of the payments to the providers. The applicability of the refund exception is not eliminated simply because a fund may have recouped its losses from another source. Indeed, a contrary view would mean, notwithstanding our own and the Comptroller General's precedents, that the refund exception would not apply to revolving funds that are permitted to set the rates of contributions and deposit the contributions into the fund. Moreover, in this particular case, the rate-setting authority in section 322(d) does not require (even if it might allow) GSA to reimburse agencies for, essentially, an unexpected reduction in costs. Rather, consistent with practice in other situations when rates were set too high, *see* Barclay Letter at 5, the agencies will benefit from the settlement in the future from the ability of the IT Fund to provide more services or charge lower rates. (Similarly, when rates are too low, the Fund generally absorbs the shortfall in the short term. *Id.*)

The situation is similar to that in *FEMA*, where the Comptroller General held that, under the refund exception, FEMA could deposit into its revolving National Insurance Development Fund amounts from a False Claims Act suit that reimbursed it for improper payments from the Fund to holders of FEMA's insurance policies. Yet the Fund was funded by, among other sources, "insurance premiums, fees and related charges," 69 Comp. Gen. at 261, and the Comptroller General thus recognized that "[i]n practice, the losses the Fund suffers and the administrative costs FEMA incurs to administer the crime insurance and riot reinsurance programs are borne by program beneficiaries," *id*. at 263; *see also FCA Recoveries*, 28 Op. O.L.C. at 28 (recognizing that revolving funds at issue "authorize[ed] payments both into and out of [the funds] with no fiscal year limitation"). The Comptroller General did not suggest that the award must be directly provided to the program beneficiaries. Similarly, the Comptroller General has held that the Tennessee Valley Authority could, under the refund exception, retain in its TVA Fund awards representing the losses from false claims, and recognized that such retention would "fully reimburse" both the TVA "and its customers for their losses." *TVA*, 2000 WL 230221, at *3. He did not suggest that the TVA Fund must directly pass on any of the recovery to its customers. So also here, the IT Fund, by retaining amounts representing a refund for excessive payments made to the

providers, is made whole and, as a result, also benefits its customer agencies, for which the Fund exists.

In addition, as in *FEMA* and *TVA*, and as suggested by the discussion above of rates and cost fluctuations, GSA was not a mere conduit for payments under the FTS2001 contracts: GSA negotiated and executed the contracts (being the only governmental entity that was a party to the contracts); guaranteed payment from the IT Fund (and thus was liable whether or not the customer agency paid the Fund); actually made the initial payment for the overwhelming majority of services, without regard to whether it had received any reimbursement from the relevant customer agency; and provided customer and technical support to the customer agencies, including, as noted, assisting the Justice Department in the litigation. GSA did not simply pass through the providers' charges, but rather charged the customer agencies rates that it "set at levels to ensure a fair and equitable allocation of GSA's costs of operating FTS programs (direct costs for services acquired, and GSA's overhead and internal costs of operations) as well as providing sufficient capital maintenance." Barclay Letter at 5. Although, in *Rebates From Travel Management Center Contractors*, 65 Comp. Gen. 600 (1986), and *Accounting for Rebates From Travel Management Center Contractors*, 73 Comp. Gen. 210 (1994), the Comptroller General concluded that rebates received by GSA from travel management centers must be provided to the federal agencies that had used the centers, in both of those cases, GSA apparently was nothing more than a mediator. GSA did negotiate with the travel centers to collect rebates on travel, but was not itself party to any of the travel center contracts, and did not even serve as a conduit for payment for the agencies that were. 65 Comp. Gen. at 601. Each federal agency arranged its own travel directly with the travel centers and, pursuant to its own contract, paid the centers directly from its own appropriations. *Id*. Indeed, each agency's rebate was tied directly to that agency's volume of travel. Barclay Letter at 7.[*]

It does not alter our conclusion that some of the settlement amount might be considered to represent overcharges for the 9% of services for which payment was made directly by agencies, rather than the IT Fund. The mere fact that these moneys were not directly paid out by the IT Fund is not conclusive. We have previously determined that an agency may retain the portion of a False Claims Act damages award representing amounts that were never actually disbursed from the

---

[*] Editor's Note: In preparing this opinion for publication, we noticed errors in the description of the two Comptroller General opinions discussed in this paragraph. Notably, GSA was a party to the contracts with the travel management centers and did serve as a conduit for payment by the agencies in certain cases. 65 Comp. Gen. at 601. Although the specific descriptions of the opinions should therefore not be relied on, the errors do not affect the paragraph's conclusion that the Comptroller General opinions are distinguishable because GSA's role in both of those cases was more limited than in the matter addressed in this opinion. The agencies, not GSA, were ultimately responsible for the payments to the travel management centers and made those payments out of their own appropriations.

agency's revolving fund, where those amounts could still be considered losses to the fund. *See FCA Recoveries*, 28 Op. O.L.C. at 27–28 (reduced interest income, as well as additional interest expense, and administrative, investigative, and litigation costs caused by the false claim). The ultimate question for fulfilling the purpose of the refund exception is how the agencies affected by the overcharges can best be made whole and returned to the position that Congress intended for them; or, to put it differently, the question is whether any improper augmentation would occur if the refund were allocated in a particular way. *See id.* at 28 ("allowing the agency to retain interest on single damages and the administrative costs of false claims would not be an improper augmentation of the agency's appropriation"); *FEMA*, 69 Comp. Gen. at 263 ("only by allowing FEMA to credit the Fund with an amount that will cover all of its losses, including the principal amount of the false claims that were paid, interest on that amount, plus any administrative expenses that the Fund incurred in paying or recovering these amounts, will the Fund be 'made whole' for its losses in this case"); *Bureau of Prisons—Disposition of Funds Paid in Settlement of Breach of Contract Action*, 62 Comp. Gen. 678, 682 (1983) (holding that Bureau of Prisons could use moneys recovered from breach of contract that exceeded amount paid under the contract, in order to fund a replacement contract, because the agency would be "made whole at no additional expense to the taxpayer").

Here, the purpose of the refund exception is best served if the entire amount of damages is allowed to be retained by the IT Fund. Although, as noted, there are invoices for each agency, it appears that, because of the peculiarity of the overcharges and the nature of the settlement, it is not possible to determine how much (if at all) any given agency was overcharged, or even how much (if any) of the overcharges involved the small number of directly billed agencies. *See* Barclay Letter at 2–3. The settlements "were negotiated on behalf of the government as a whole," not agency by agency, "and given the methodology of determining settlement amounts, it is not possible to assign exact amounts to individual agencies." *Id*. at 6; *see also id.* at 7–8 ("given that the settlements were reached based on negotiation and statistical evidence, there is no way to determine what each individual agency's exact percentage of the total overpayment was"). Thus, there is no reason to believe, as far as we are aware, that 9% of the settlement would represent overcharges for the 9% of services that were directly billed, and in any event the settlement agreements themselves do not make such a division.

What is clear, however, is that the entire settlement amount for actual damages represents a refund to the government for overcharges of telecommunications services. Where there is no credible way to allocate any specific portion to the directly paying agencies, it is more consistent with the policy of the refund exception—i.e., making the agencies whole pursuant to the anti-augmentation principle—for the portion of any overcharges that might be allocable to them to be used by the government as a refund of telecommunications overcharges in some fashion, by being retained by the IT Fund, than to be deposited into the general

fund of the Treasury. The funds retained in the IT Fund will by statute be used for the benefit of these agencies: "to efficiently provide information technology resources to federal agencies and to efficiently manage, coordinate, operate, and use those resources." 40 U.S.C. § 322(c)(1). GSA therefore seeks to retain this settlement amount in the Fund "to apply to government-wide telecommunications needs," Barclay Letter at 1, and "lower future costs for all customer agencies," *id*. at 3. This use of the recovered funds is ensured—and any augmentation concern is further mitigated—by section 322(f), which, as noted in Part I, requires that at the close of each fiscal year the IT Fund must transfer any excess funds to the Treasury as miscellaneous receipts.

Furthermore, even, for agencies directly billed by the providers, it was GSA rather than the agencies that was the party to the contracts with the providers, and it was the GSA's IT Fund that "paid the bills to the companies" "if an agency failed to meet its obligation." Barclay Letter at 6. Even when the directly billed agencies did pay the providers, they were paying the rates that had been set by GSA and thus were benefiting from GSA's services. And even though this small minority of agencies left it to the providers to forward the percentage fee to GSA, their rate payments were still part of the overall scheme of the IT Fund and the FTS2001 contracts that the Fund financed. Correspondingly, refunds retained by the IT Fund will benefit the directly billed agencies in the future just as they will benefit the centrally billed agencies. They are among "all [the] customer agencies" that will benefit from "lower future costs." *Id*. at 3. We therefore conclude that the IT Fund may retain the entirety of the approximately $24.5 million settlement it has received from the Justice Department that represents actual damages.

C. KEVIN MARSHALL
*Deputy Assistant Attorney General*
*Office of Legal Counsel*